UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
NAVALMAR (U.K.) LTD.,                             :
                                                  :     **OPINION AND ORDER**
                              Plaintiff,          :     **DENYING MOTION TO VACATE**
            -against-                             :     **MARITIME ATTACHMENT**
                                                  :
WELSPUN GUJARAT STAHL ROHREN, LTD.,               :     07 Civ. 372 (AKH)
                                                  :
                              Defendant.          :
------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

    I consider in this opinion Defendant's motion to vacate a maritime attachment. The issues raised by the motion are important in maritime law, and are the subjects of divided opinions among district judges in the Second Circuit as to: (a) whether electronic funds transfers through New York clearing banks can be attached; (b) whether a vessel owner can bring an admiralty claim in this Court and obtain an attachment of the charterer's money and property to secure the vessel owner's claim in arbitration against the charterer for indemnification; and (c) whether the order of attachment, once having been served personally, may thereafter be served electronically and in the manner required by the garnishee.

    On January 17, 2007, Plaintiff Navalmar (U.K.) Ltd. ("Navalmar") filed a complaint in this court against defendant Welspun Gujarat Stahl Rohren, Ltd. ("WGSR") and moved immediately and ex parte, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, Fed. R. Civ. P. (hereinafter "Admiralty Rule B"), to attach and garnish the property of the defendant in this district. I granted the motion and issued an order of attachment.

    On February 7, 2007, WGSR moved to vacate the attachment, pursuant to Rule E of the Supplemental Rules for Certain Admiralty and Maritime Claims, Fed. R. Civ. P.

1

(hereinafter "Admiralty Rule E"). I heard oral argument on February 21, 2007, and reserved decision. For the reasons stated below, I deny Defendant's motion.

## Background

Plaintiff Navalmar alleges that it was the owner of the M/V Patara, and that, on February 2, 2004, it time-chartered the vessel to defendant WGSR for a year, plus or minus one month at charterer's option. In February 2005, the charterer embarked on a voyage from Turkey to Yemen, carrying steel reinforcing bars. During discharge of the cargo in the port of Aden, completed March 27, 2005, the consignee complained of damage to cargo, filed suit in the Aden Commercial Court, and caused the vessel to be arrested as security for the consignee's claim of damaged cargo. Plaintiff Navalmar retained attorneys, the affected parties retained surveyors to investigate and evaluate the damage and, following their reports, the Aden court fixed security in the amount of one million dollars, to be satisfied by bank guarantee. Navalmar, the owner, filed the security and obtained release of the ship on May 2, 2005. Meanwhile, Plaintiff alleges, Defendant withheld hire in breach of the charter,[1] causing it to sustain further damage. Proceedings in the Aden Commercial Court between the consignee and Navalmar remain pending.

Arbitration in London followed between Navalmar and WGSR, the vessel owner and the charterer, respectively. On November 18, 2005, the arbitrators granted Navalmar an interim award for withholding hire of $271,350 plus interest, finding that WGSR's loss of use of the vessel was not "the consequence of any breach of charter on the part of [Navalmar]." Clyne Aff., Ex. A ¶ 19. WGSR declined to pay the award. Plaintiff Navalmar then brought this action against WGSR pursuant to 9 U.S.C. § 8, in aid of Navalmar's claims against WGSR in the

---

[1] To "withhold hire" is to fail to pay the vessel owner for use of the vessel as agreed in the charter party. See e.g., 2A-XVII Benedict on Admiralty § 176 ("The charterer cannot withhold hire because of a claim for cargo damage").

London arbitration, seeking to attach and recover (a) the interim award granted by the arbitrators plus interest ($298,559.20); (b) as counter-security for the bank guarantee of $1,000,000 given in the Aden Commercial Court to free the M/V Patara, an attachment in like amount; (c) the expense of procuring the bank guarantee ($38,462.78); (d) the legal fees and costs in connection with the London arbitration (£76,787.74); and (e) the legal fees and costs in connection with the defense of the cargo claims in Aden ($356,433.16).  In total, Plaintiff sought to attach approximately $1,900,000 to secure its claims for damages and indemnification.[2]  I granted the request and issued an order of attachment.

Plaintiff made personal service of the attachment order on garnishee Citibank, N.A. ("Citibank") on January 18, 2007, but no property belonging to Defendant was then in Citibank's possession.  Citibank advised Plaintiff that its compliance with renewed levies of the order of attachment would depend on adherence to Citibank's established procedures: electronic service by fax or email within designated hours to a designated center, rather than personal service on a branch manager or bank officer; and, in the event of such compliance, that funds passing through the bank at any point of the business day, whether before or after the time of electronic service and resulting from either a send or receive order of or on behalf of respondent, would be considered as garnished and held subject to the order of attachment.  Navalmar complied with Citibank's procedures, issuing daily electronic levy each business day following January 18, 2007.  The order of attachment authorized renewed levies within a certain period until the amount provided was secured.[3]

---

[2]  WGSR has since paid the interim award and interest thereon, leaving approximately $1.6 million subject to the attachment of this Court.  (Tr. 6, 15).

[3] See infra Part III.C for a discussion of the order of attachment.

On February 2, 2007, Citibank advised Navalmar that it had received an electronic funds transfer ("EFT"), originated at the order of WGSR, in the amount of $3,289,159.00, and that it would hold sufficient of this amount subject to the order of attachment. See Lyons Decl., Ex. H; Praveer Decl., ¶ 23. On February 7, 2007, defendant moved, pursuant to Admiralty Rule E(4)(f), to vacate the attachment. I now must decide the validity of the attachment.

## Discussion

### I. The Admiralty Rules of Attachment

The Admiralty Rules provide that where a Defendant cannot be found in the district in which the complaint is filed, the complaint "may contain a prayer for process to attach the defendant's tangible or intangible personal property—up to the amount sued for—in the hands of garnishees named in the process." Admiralty Rule B(1)(a). The plaintiff or plaintiff's attorney must sign and file with the complaint an affidavit stating that, to the affiant's knowledge, or on information and belief, the defendant cannot be found within the district. Admiralty Rule B(1)(b). The court must review the complaint and affidavit and, if the conditions set out in Rule B appear to exist—namely, that the defendant is not found in the district—the court must enter an order authorizing process of attachment and garnishment. Id. The clerk may enter supplemental process enforcing the court's order upon application without further court order. Id.

Admiralty Rules B and E govern the procedure for service of process of maritime attachment and garnishment. If the property to be attached is a vessel or property on board a vessel, the process must be delivered to the marshal for service; if otherwise, service of process may be made by either the marshal or an individual appointed by the court. Admiralty Rule

B(1)(d). If intangible property is to be attached, the process server "shall execute the process by leaving with the garnishee or other obligor a copy of the complaint and process requiring the garnishee or other obligor to answer as provided in [the Admiralty Rules]."

Admiralty Rule E provides that "[w]henever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated …." Admiralty Rule E(4)(f). The text of Admiralty Rule E(4)(f) does not explain, however, "under what circumstances the district court should vacate the attachment." Aqua Stoli v. Gardner Smith Pty. Ltd., 460 F.3d 434, 438 (2d Cir. 2006). For the relevant standard of review, the Court looks to the Second Circuit's decision in Aqua Stoli, supra, which addressed the showing a plaintiff must make to sustain a maritime attachment following defendant's motion to vacate.

## II.    Aqua Stoli and the District Court's Standard of Review

In Aqua Stoli, the defendant charter party, Gardner Smith, refused to load cargo at a port in Brazil, claiming that the chartered vessel, owned by Aqua Stoli, was not seaworthy. Aqua Stoli denied unseaworthiness, and commenced arbitration proceedings in London. Gardner Smith counterclaimed, and attached Aqua Stoli's vessel as security. Aqua Stoli, claiming entitlement to counter-security, filed suit in the Southern District of New York and moved ex parte under Admiralty Rule B for an order of attachment. The district court granted the motion. See id. at 436–37.

Gardner Smith then moved pursuant to Admiralty Rule E(4)(f) to vacate the New York attachment. The district judge, observing that there were no criteria provided by Rule E(4)(f), fashioned a balancing test and vacated the attachment as not needed under the circumstances. Aqua Stoli v. Gardner Smith Pty Ltd., 384 F. Supp. 2d 726 (S.D.N.Y. 2005).

The Second Circuit reversed, holding that "once a plaintiff has carried his burden to show that his attachment satisfies the requirements of [Admiralty Rule B], a district court may vacate an attachment only upon circumstances not present in [Aqua Stoli]." Aqua Stoli, 460 F.3d at 436.

The Second Circuit ruled that the party seeking an attachment has the burden to show that "1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment." Aqua Stoli, 460 F.3d at 445. If a party satisfies that burden, and meets the filing and service requirements of Admiralty Rules B and E, the attachment may not be vacated, except in limited circumstances not relevant here. See id. (suggesting circumstances that would permit the district court to vacate a maritime attachment).

### III.    The Issues Presented by this Case

Defendant's motion raises three issues: (a) whether Plaintiff's claim for indemnification, because the underlying claim has not been resolved or paid, is premature and therefore not a "valid prima facie admiralty claim" as Admiralty Rule B requires; (b) whether an EFT, received for onward transmission by a New York clearing bank for payments in United States dollars, is subject to maritime attachment; and (c) whether Plaintiff's service upon Citibank complied with the requirements of Admiralty Rules B and E.

   A. <u>Plaintiff States a Valid Prima Facie Admiralty Claim</u>

The attachment whose validity I must determine was brought in aid of the claim in arbitration of Navalmar, as vessel owner, against WGSR, as charterer. See 9 U.S.C. § 8. The parties do not dispute that the goods carried by the M/V Patara between Turkey and Yemen suffered damage in the ocean carriage. Initially, the court-appointed surveyors assessed the

6

damage in the amount of $3.5 million, but reduced the assessment to $1 million inclusive of costs, after negotiations with surveyors appointed by the cargo receivers and the owners.  The determination of the Aden Commercial Court that a bank guarantee of one million dollars would be adequate security to secure payment to the consignee enabled Navalmar to free its vessel from arrest, an action that benefited WGSR as well as itself, for responsibility could be found, and damages could mount, against WGSR.

Navalmar's claim in the London arbitration seeks to fix responsibility for the cargo damage on the charterer, WGSR, in whole or in part.  As the Interim Award of the arbitrators in favor of Navalmar suggests, Navalmar has brought a timely and appropriate claim against WGSR to gain indemnity for incurring expense, both in Aden and in London, and for having to pay the consignee of the damaged merchandise.  See generally Clyne Aff., Ex. A (Interim Final Award).  Thus, Navalmar comes to this Court to gain security for its claims against WGSR, by attaching and garnishing money and property of WGSR.

Defendant argues that because neither the Aden Commercial Court nor the London arbitration tribunal has come to a determination of liability, Plaintiff's claim for indemnity is "unaccrued" and that an unaccrued claim for indemnity is not a "valid prima facie admiralty claim."  Therefore, it continues, Plaintiff has failed the test set forth in Aqua Stoli, and the attachment should be vacated.  In addition, although not argued by defendant, the charter party between Navalmar and WGSR provides preconditions for suit that also should be reviewed.  In both instances, the question is whether the plaintiff's complaint for an attachment has stated a "valid prima facie admiralty claim," and that is a question of substantive law.  See Sonito Shipping Co. Ltd. v. Sun United Maritime Ltd., No. 06 Civ. 15308, 2007 U.S. Dist. LEXIS 19531 at *9–10 (S.D.N.Y. Mar. 19, 2007) (Haight, J.).

7

i. The Issue of Claim Accrual

Cases involving arrests of ships in foreign ports to secure claims of lost or damaged cargo during ocean voyages, and discharges of ships from arrests by filing security with the arresting court in the form of surety bonds or bank guarantees, are classically the subjects of admiralty lawsuits.  The ship arrests, and substitutions for the arrested ship by surety bonds and bank guarantees, become the bases of jurisdiction in the courts of the port city, and provide security enabling shippers and consignees to recover their losses.  Vessel owners, forced thereby to pay for losses attributable to the fault or responsibility of their charterers, in whole or in part, may assert claims of indemnity against their charterers, and frequently do so in arbitrations held in London.

Several district judges, using the label "unaccrued," "premature," or "unripe," have ruled that a claim for indemnity by the vessel owner, that is, one brought before the consignee's claim against the owner is judicially determined or otherwise resolved, may not be basis of a maritime attachment.  Other judges have ruled to the contrary, that a claim for indemnity is a lawful admiralty claim, and one that qualifies under Admiralty Rule B as entitling the plaintiff to an arrest of ship or attachment or garnishment of money or property found in the district.  Compare Sonito Shipping Co. Ltd., supra, (vacating attachment); J.K. Int'l Pty. Ltd. v. Agriko S.A.S., No. 06 Civ. 13259, 2007 U.S. Dist. LEXIS 10074 (S.D.N.Y. Feb. 13, 2007) (vacating attachment); Bottiglieri Di Na Vigazione Spa v. Tradeline LLC, No. 06 Civ. 3705, 2007 U.S. Dist. LEXIS 8278 (S.D.N.Y. Feb. 6, 2007) (vacating attachment); with Daeshin Shipping Co. v. Meridian Bulk Carriers, Ltd., No. 05 Civ. 7173, 2005 U.S. Dist. LEXIS 22409 (S.D.N.Y. Oct. 3, 2005) (upholding attachment); Eitzen Sealift A/S v. Cementos Andinos Dominicanos, S.A., 2005 U.S. Dist. LEXIS 19876 (S.D.N.Y. 2005) (upholding attachment);

Starsonet Shipping Ltd. v. North Star Navigation Inc., 659 F. Supp. 189 (S.D.N.Y. 1987) (upholding attachment).

I find in the case before me that plaintiff Navalmar's claim in the London arbitration for indemnity against WGSR, the charterer, states a prima facie admiralty claim. Navalmar, having been required to file a million dollar bank guarantee in the Aden Commercial Court, to secure the consignee of the goods for damaged cargo during an ocean voyage aboard the M/V Patara while it was chartered to WGSR, has a direct interest in securing its claim of indemnity against WGSR.  In effect, Navalmar has had to prepay a debt owed by it or WGSR, as may be determined, and should have the right by attachment to secure its claim against WGSR for indemnity, just as the consignee of the goods gained security against Navalmar by arresting the vessel owned by Navalmar.  The entire point of an attachment, as a provisional remedy before trial, is to secure a plaintiff's claim before it can be adjudicated.  In a world of shifting assets, numerous thinly-capitalized subsidiaries, flags of convenience and flows of currencies, maritime attachments have particular importance.  See e.g., Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co., 85 F.3d 44 (2d Cir. 1996) ("Maritime attachment is by any test a characteristic feature of the general maritime law.").

    ii.   Provisions in the Charter Party for Suits Between Vessel Owner and Charterer

The charter party for the M/V Patara incorporated the New York Produce Exchange form and its provisions.  Clause 91 of the form provides that disputes arising under the charter party "shall be governed by and construed in accordance with English Law."  Clause 77 of the Form provides that "cargo claims shall be settled in accordance with Inter-Club New York

Produce [Exchange] Agreement as amended in 1996, and any subsequent amendments" (hereafter, the "ICA").[4]

The ICA is a well-known, long-established agreement among property and indemnity clubs of shipowners and charterers, to provide insurance against maritime risks and to apportion liability for claims of cargo damage arising under charter parties.  See Sonito Shipping, 2007 U.S. Dist. Lexis at *13 (quoting Siderius, Inc. v. M/V Amilla, 880 F.2d 662, 664 (2d Cir. 1989)).  Clause 4 of the ICA provides in relevant part:

> Apportionment under this Agreement shall only be applied to cargo claims where: (a) the claim was made under a contract of carriage, whatever its form … and (b) the cargo responsibility clauses in the charterparty have not been materially amended. … and (c) the claim has been properly settled or compromised and paid.

In Sonito Shipping, Judge Haight considered if, under English law, clause 4(c) should be interpreted to require that cargo claims be "properly settled and paid" before "a cause of action for indemnity [will be allowed to] accrue," or if "the ICA should be read as indemnifying against liability rather than against the discharge of liability."  See id. at *27–28.  Judge Haight observed that, in the absence of precedents in England, two South African decisions, holding that "the obligation to indemnify only arises once the underlying claims have been met," probably would be followed by an English court and, in turn, they should be followed by an American court.  Id. at *29.  Thus, Judge Haight ruled that Sonito had not shown that it had a valid maritime claim against the defendant at the time of attachment.  Id. at 30; accord Bottiglieri Di Na Vigazione, supra; see also J.K. Int'l Pty. Ltd., supra; T & O Shipping, Ltd. v. Lydia Mar Shipping Co., 415 F. Supp. 2d 310 (S.D.N.Y. 2006).

---

[4] Clause 77 omitted the word "Exchange."

10

In Sonito and Bottiglieri, however, there had been no ship arrests or equivalent provisional remedy to secure payment by a vessel owner of a claim of damaged cargo. Nor had the plaintiff in those cases secured an interim award in an arbitral hearing making findings of fact favorable to the plaintiff's case. Navalmar's case is different. Navalmar, in effect, has prepaid the full claim of the consignee by order of the Aden Commercial Court, for the credit of WGSR as well as of itself, and seeks to secure its claim for indemnity against WGSR. The conditions of this case, flowing from litigation and a ship arrest in the Aden Commercial Court and a consequent arbitration in London, are significantly different from the conditions of Sonito, Bottiglieri, and like cases.[5] The parties have cited no precedent to suggest that Clause 4 of the ICA should apply where a vessel owner has had to prepay an obligation potentially owed by the charterer for goods damaged in an ocean voyage arranged by the charterer.

For the reasons stated, I hold that Navalmar has stated a valid prima facie admiralty claim against WGSR, thus satisfying Admiralty Rule B, Fed. R. Civ. P. Having held that Navalmar has stated a valid claim, there is no need to consider whether to exercise whatever discretion remains after Aqua Stoli to "disregard" a plaintiff's failure to comply with Admiralty Rule B. See Greenwich Marine, Inc. v. S.S. Alexandra, 339 F.2d 901, 905 (2d Cir. 1965). I now turn to the question whether Navalmar has complied with the procedural requirements of Admiralty Rules B and E.

> B. Electronic Fund Transfers through Intermediary Banks are Subject to Maritime Attachments

Customarily, international payments are effected by cable or wire transfers. See DONALD I. BAKER ET AL., THE LAW OF ELECTRONIC FUND TRANSFER SYSTEMS (hereinafter "LAW

---

[5] In other cases, no proceeding against the plaintiff had commenced at all, rendering its claim for indemnification speculative. See e.g., J.K. Int'l, 2007 U.S. Dist. LEXIS at *15–16 ("[T]here is nothing in the record … to suggest that a lawsuit against Plaintiff, for which Plaintiff can then sue Defendant for indemnity, is on the horizon.").

11

OF EFTs") ¶ 30.01[2].  A foreign buyer at one point of the globe, wishing or required by the transaction to pay in dollars to a foreign seller in another point of the globe, often will make that payment through an intermediary bank located in New York.  See Banque Worms v. BankAmerica Int'l, 77 N.Y.2d 362, 370 (1991).  A sending bank originates an electronic funds transfer between two banks by sending a message to a central computer system, which creates a record of the transaction and adjusts the accounts of the sending and receiving banks.  See Manufacturas Int'l, Ltda v. Manufacturers Hanover Trust Co., 792 F. Supp. 180, 187 (E.D.N.Y. 1992).  The first receiving bank may also be an intermediary bank which, having received an electronic order to pay the seller's bank for credit to the seller, fulfills that order by crediting the foreign account of the seller's local bank, if there is such an account, or by forwarding funds by the intermediate bank's own payment order to a bank at which the seller has an account.  See id.; BAKER ET AL., LAW OF EFTs ¶ 30.02[1]; N.Y. U.C.C. § 4-A-403 cmts. 1–2.

An order of attachment levied upon the seller's, or the buyer's, interest in property at the intermediary bank in New York seeks to intercept the funds at transition, at the point where the transfer has been received from the originator's bank but before the intermediary bank has credited the beneficiary bank's account or transmitted its payment order to the beneficiary bank for ultimate credit to the seller, or beneficiary.  See Winter Storm Shipping Ltd. v. TPI, 310 F.3d 263 (2d Cir. 2002); United States v. Daccarett, 6 F.3d 37 (2d Cir. 1993) (holding that "an EFT while it takes the form of a bank credit at an intermediary bank is clearly a seizable res under the forfeiture statutes.").  The process requires that "intermediary banks possess the funds, in the form of bank credits, for some period of time before transferring them on to destination banks."  Daccarett, 6 F.3d at 54.

Thus, electronic fund transfers received by an intermediary bank for onwards transferring may be attached pursuant to Admiralty Rule B. See id.; Aqua Stoli, 460 F.3d at 436 ("Under the law of this circuit, EFTs to or from a party are attachable by a court [sitting in admiralty] as they pass through banks located in that court's jurisdiction."). In Winter Storm, as with WGSR here, the defendant was the originator of the EFT, and it challenged the ability of a garnishing creditor to levy upon such funds. Winter Storm squarely held in favor of the garnishing creditor, 310 F.3d at 266, and thus Winter Storm controls my decision as well, as it controlled the decisions of other district judges in this Circuit. See e.g., Gen. Tankers Pte. Ltd. v. Kundan Rice Mills Ltd., No. 06 Civ. 8292, 2007 U.S. Dist. LEXIS 14355 (S.D.N.Y. Feb. 21, 2007); AET Inc. Ltd. v. Procuradoria de Servicos Maritimos Cardoso & Fonseca, 464 F. Supp. 2d 241 (S.D.N.Y. Dec. 7, 2006); but cf., Seamar Shipping Corp. v. Kremikovtzi Trade Ltd., 461 F. Supp. 2d 222 (S.D.N.Y. Nov. 20, 2006).

Three years after Winter Storm, the Second Circuit, although following its prior decision, dropped a footnote that questioned its correctness. Aqua Stoli, 460 F.3d at 446 n.6 ("The correctness of our decision in Winter Storm seems open to question …."). The conceptual difficulty expressed by the Aqua Stoli court arises in the difference between New York banking law and federal maritime law. In the 1960s, the Federal Reserve Bank of New York and the New York Clearing House Association, as well as other organizations, began work on what would eventually culminate in today's electronic fund transfer systems. See BAKER ET AL., LAW OF EFTs ¶ 1.03[9]. As these systems emerged, so did novel legal issues for banks, creditors, and debtors. In the 1980s, members of the National Conference of Commissioners on Uniform State Laws and the American Law Institute began drafting Article 4-A to the Uniform Commercial

Code to respond to the growing need for a uniform legal framework to regulate EFT transactions. See id.  The New York legislature adopted Article 4-A in 1990.

The "New York Legislature sought to achieve a number of important policy goals through enactment of [Article 4-A]," among them "uniformity in the treatment of electronic funds transfers … speed, efficiency, certainty (i.e., to enable participants in fund transfers to have better understanding of their rights and liabilities), and finality." Banque Worms, 77 N.Y.2d at 372.  Finality in electronic fund transfers was said to be a "singularly important policy goal," to honor a more general "concern for finality in business transactions." Id.  The New York legislature and the New York courts thus gave special recognition to New York's historic commercial and banking interests, making sure that the logic and force of its common law of attachments and quasi in rem jurisdiction would not create an impediment to the growth and stability of those long term commercial and banking interests.  See European American Bank v. Bank of Nova Scotia, 12 A.D.3d 189 (App. Div. 1st Dept. 2004) (holding attachment of funds at intermediary bank invalid under N.Y. U.C.C. § 4-A-502); Banque Worms, 77 N.Y.2d at 372.

In Seamar Shipping, the district court ruled that it did not have to follow Winter Storm with regard to an attachment of an EFT passing through an intermediary bank in New York for ultimate credit to a foreign defendant.  United States District Judge Jed S. Rakoff considered that the footnote dictum in Aqua Stoli narrowed Winter Storm to its facts, and cited both cases for the proposition that "state law may be borrowed if there is no federal admiralty law in point on the particular question presented." Seamar Shipping, 461 F. Supp. 2d at 225.  Having determined that Winter Storm was not in point, Judge Rakoff turned to New York law and, relying on the Official Comment to N.Y. U.C.C. § 4-A-502, held that "until the funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit

14

of the beneficiary, the beneficiary has no property interest in the funds transfer which the beneficiary's creditor can reach." See id. at 226 (quoting N.Y. U.C.C. § 4-A-502 cmt. 4).

This deference to the policy interests of the State of New York, in my opinion, is misplaced, for it contradicts the historic purposes of maritime law, and the clear authority of Winter Storm. Maritime law deals with transitory items; "[t]hus, the traditional policy underlying maritime attachment has been to permit the attachments of assets wherever they can be found and not to require the plaintiff to scour the globe to find a proper forum for suit or property of the defendant sufficient to satisfy a judgment." Aqua Stoli, 460 F.3d at 443. As long as maritime interests find it suitable to settle transactions in United States dollars, and as long as banks in New York provide the clearances for such payments, there will be a flow of those dollars through the New York banks. The federal interest in maintaining the "proper harmony and uniformity" of maritime law must prevail, and any contradictory interest of New York law should not be followed. See Winter Storm, 310 F.3d at 279–80 (quoting American Dredging Co. v. Miller, 510 U.S. 443, 446–47 (1994)); Noble Shipping, Inc. v. Euro-Maritime Chartering Ltd., No. 03 Civ. 6039, 2003 U.S. Dist. LEXIS 23008 at *10 (S.D.N.Y. 2003); see also Palestine Monetary Auth. v. Strachman, 2005 N.Y. Misc. LEXIS 3517 at *34 n.13 (N.Y. Sup. Ct. 2005) (observing that under Winter Storm, admiralty law preempts Article 4-A); N.Y. U.C.C. § 4-A-107 cmt. 3 (raising possibility of preemption by Federal Reserve Board regulations).

Even if Winter Storm did not resolve this issue—and a growing consensus asserts that Winter Storm resolved the issue and remains controlling, see Compania Sudamericana de Vapores S.A. v. Sinochem Tianjin Co., 2007 U.S. Dist. LEXIS 24737 (S.D.N.Y. Apr. 4, 2007) (collecting recent cases)—I would not necessarily follow N.Y. U.C.C. § 4-A-502. The drafters of the Uniform Commercial Code, taking a policy position that favors an uninterrupted flow of

EFTs, provided that creditors' levies should be honored only at the originating and receiving banks, and stated in a Comment that an EFT in the hands of an intermediary bank is not a "property interest" that the "beneficiary's creditor can reach." N.Y. U.C.C. § 4-A-502 cmt. 4. But clearly it is property, for the money belongs to someone, either the originator of the funds transfer, or the beneficiary, directly or through their banks. The statement of the drafters is a statement of state legislative policy, not an analysis to declare, or negate, property rights. Indeed, the policy position adopted by the drafters departs from common law understanding of property, for certainly the funds, in temporary possession of the intermediary bank, are subject to rights of another "to possess, use, and enjoy" those funds. BLACK'S LAW DICTIONARY 1232 (7th ed. 1999). The bank's obligation to comply with instructions it receives from originating and beneficiary banks is contractual, and a contract expectancy constitutes a property interest so long as it is not contingent on future events. See Supreme Merchandise Co. v. Chemical Bank, 70 N.Y.2d 344, 350 (N.Y. 1987). The same flow of funds, in temporary possession of the intermediary bank, is subject to forfeiture, see Daccarett, supra; 18 U.S.C. § 981(b)(2)(A), an application very difficult to distinguish from this case. See Winter Storm, 310 F.3d at 277–78. As Chemical Bank, supra, makes clear, however, the analysis of intangible expectancies as property does not resolve all questions, for, as with all property, tangible and intangible, the holder enjoys a "bundle of rights" whose contours may be shaped by what state policy is ready, willing, and able to enforce, subject to constitutional limitations. See U.S. Const. amend. V.

The case before me presents a clash of policies: state law protections of banking and commercial interests, and federal law which, in this instance, is protective of admiralty interests. In the absence of federal legislation on this subject, the admiralty interests, and the law of Winter Storm must prevail, as a matter of federal supremacy. See U.S. Const. art. VI, cl. 2.

16

      C.      <u>Constantly Replenished and Electronic Modes of Serving Process under Admiralty Rules B and E</u>

The order of attachment presented to me ex parte by Navalmar, and which I signed, authorized a Marshal or designated process server to attach goods and chattels, and property, credit, and effects being held by any garnishee within the district, in an amount up to and including $1,900,000. The order provided that "following initial service upon any garnishee by the United States Marshal or any other person designated by Order to make service in this action, supplemental service of the Process of Maritime Attachment and Garnishment may thereafter be made by way of facsimile transmission or other verifiable electronic means, including e-mail, to each garnishee so personally served." The order provided further that "service on any garnishee herein is deemed to be effective and continuous service throughout the remainder of the day upon which such service is made commencing from the time of such service through the opening of the garnishee's business the next business day." Navalmar caused the order to be served personally on Citibank and other banks in New York City by persons authorized by the order. No funds were attached on the day of personal service, January 17, 2007.

Citibank requires, for all subsequent services of orders of attachment, that service be made electronically (fax or email), at a prescribed location, at or before a certain time, and to the attention of a prescribed office, person, and email address, and represents that funds transferred into the bank at any time within the banking day, until 5:30 p.m., will be considered as held by the bank for the garnished debtor and, therefore, for the garnishing creditor, as at the time of the electronically served and conforming levy. <u>See</u> Lyons Decl., Ex. N. Defendant WGSR, moving to vacate the attachment, contends that Navalmar's initial levy was ineffective for not capturing a <u>res</u> belonging to WGSR at the time it was served, and that since all

17

subsequent levies did not comply with the personal service requirements of Admiralty Rules B and E, the attachment in favor of Navalmar should be vacated. WGSR'S arguments are without merit.

      i. Garnishees May Agree to Hold Service of Process Effective

While it is clear that "process and a res must coexist in the hands of the garnishee at a single moment in time," Ythan Ltd. v. Americans Bulk Transport Ltd., 336 F. Supp. 2d 305, 307–08 (S.D.N.Y. 2004), an agreement between the garnishor and garnishee may make the service effective for such time as the garnishee agrees to accept the burden of "remaining vigilant." Reibor Int'l Ltd. v. Cargo Carriers (KACZ-CO.) Ltd., 759 F.2d 262, 267 (2d Cir. 1985), 759 F.2d at 267. Citibank, by internal regulation, made such an agreement with the garnishor in order to lessen its burden of remaining vigilant—and the consequences to it of not being able to coordinate movements of funds until service of process potentially affecting such funds.

In the ordinary case, a levy is effective to attach property of a defendant in the possession of the garnishee at the moment of levy and the report thereof by the garnishee. If, between a levy and the garnishee's report, the defendant's property has moved from the garnishee's possession, because of prior instructions to the garnishee or otherwise, the garnishee becomes exposed to personal liability. See Salles v. Chase Manhattan Bank, 300 A.D.2d 226, 230 (App. Div. 1st Dept. 2002) (citing Mazzuka v. Bank of North America, 53 Misc. 2d 1053 (Civ. Ct. 1967)). Since EFTs move throughout the day at lightning speed, and quickly pass into and out of the clearing bank's possession, the burden on clearing bank garnishees is substantial, in having "to choose between setting aside other priorities to answer promptly and remaining vigilant until an answer can be prepared." Reibor, 759 F.2d at 267. Thus, the administrative

solution reflected by the Citibank's procedures was reasonable, and not precluded by anything in the Admiralty Rules. Under Reibor, a plaintiff may not compel a garnishee to hold service of process for maritime attachment effective until such time as a res comes into the garnishee's possession or the garnishee answers, but the garnishee may agree to do so, and the garnishee's procedures will not vitiate an attachment as long as they are reasonable. In any event, as Winter Storm observed, and as applied in the case before me, even if the service of process was ineffective, "[i]n point of fact … [Citibank] did place the stop order … and so [WGSR] funds were in the bank's possession when [Navalmar's] later processes of attachment were served, thereby satisfying the Reibor requirement" under any conceivable interpretation. Winter Storm, 310 F.3d at 274 n.7; Lyons Decl. ¶ 18 ("personal service [of process for maritime attachment and garnishment] was again made upon Citibank on February 12, 2007").

        ii.   Supplemental Service of Process by Fax or Email

Navalmar's ex parte motion for an attachment, and the order I signed, provided that after initial personal service was effected, "supplemental service of [process] may thereafter be made by way of facsimile transmission or other verifiable electronic means, including e-mail, to each garnishee so personally served." WGSR's motion to vacate argues that such means of electronic service are unauthorized by the Admiralty rules, and are therefore ineffective.

    Admiralty Rule E provides:

> If intangible property is to be attached or arrested the marshal or other person or organization having the warrant shall execute the process by leaving with the garnishee or other obligor a copy of the complaint and process ….

Fed. R. Civ. P., Supp. R. E(4)(c).

Navalmar's initial service was effected by leaving it with Citibank, the garnishee, as the rule required. However, as Citibank required for all subsequent executions, Navalmar

19

served its subsequent executions electronically, to a pre-designated address established for all such garnishments. In effect, copies of the complaint and process were "left" electronically, and there is nothing in the Admiralty Rules that vitiates a method of service insisted on by a garnishee to minimize disruption and inefficiency to its personnel and operations, and to improve its ability to comply with such garnishments. Of course, district judges are not free to rewrite the federal rules governing service of process, see Omni Capital Int'l v. Rudolf Wolff & Co., 484 U.S. 97, 109 (1987), but neither are the rules to be applied without consideration of modern methods of communication. As I said, process can be "left," to paraphrase Admiralty Rule E, electronically as well as physically. See Admiralty Rule E(4) ("Execution of Process"); see also Ythan, 336 F. Supp. 2d at 308 ("Just as the garnishee was free to avoid the burden of in-person service, so too was it capable of agreeing that it would deem process effective through the close of the business day."). I hold that Navalmar's maritime attachment complied with Admiralty Rules B and E.

## Conclusion

For the reasons stated, defendant WGSR's motion to vacate the order of attachment granted to Navalmar, and executed on WGSR's funds in the possession of Citibank, is denied. The parties, through counsel, shall meet with me in conference on May 11, 2007 at 9:30am to discuss the further proceedings appropriate in this case.

SO ORDERED.

Dated:   April 24, 2007
         New York, New York

ALVIN K. HELLERSTEIN
United States District Judge